**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Satchidananda Buber, et al., | No. CV-20-00219-TUC-RM |
| Plaintiffs, | **ORDER** |
| v. | |
| GrowersHouse LLC, et al., | |
| Defendants. | |

Plaintiffs Satchidananda Buber ("Buber") and Joseph Trejo ("Trejo") brought this action pursuant to the Fair Labor Standards Act (FLSA), arguing that Defendants misclassified them as exempt and failed to pay them overtime wages as required under the FLSA and Arizona state law. Pending before the Court is Defendants' Motion for Summary Judgment. (Doc. 70.) Plaintiffs responded in opposition (Doc. 74), Defendants replied (Doc. 78), and the Motion is fully briefed. For the following reasons, the Motion will be denied.

## I.     Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it

believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the Court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Pure questions of law, where there is no disputed issue of fact, are appropriate for summary judgment. *Schrader v. Idaho Dep't of Health & Welfare*, 768 F.2d 1107, 1110 (9th Cir. 1985). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. "[T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.* (internal citation omitted). In its analysis, the Court must accept the nonmovant's evidence and draw all inferences in

the nonmovant's favor. *Id.* at 255. The Court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## II.   Background

Plaintiffs brought this action against Defendants GrowersHouse LLC, GG Growth LLC, Nathan Lipton ("Lipton"), Paul Lipton, and their spouses, collectively Defendants,[1] under the FLSA. (Doc. 1.) Plaintiffs allege that Defendants unlawfully misclassified them as exempt under the FLSA and thus failed to pay them overtime wages pursuant to federal and Arizona state law. (*Id.*)[2] Plaintiffs allege that they should have been classified as non-exempt employees under the FLSA and therefore should have received overtime pay at a rate not less than one and one-half times (1.5x) their regular rate of pay for hours worked in excess of 40 hours per workweek. (*Id.* at 7.) Plaintiffs allege that their weekly hours exceeded 40 hours and that they did not receive overtime pay for the additional hours. (*Id.*) Plaintiffs allege that Defendants' violation of the FLSA was willful and that Defendants either knew or recklessly disregarded whether their conduct violated the FLSA. (*Id.* at 8.) They also allege violations of the applicable Arizona wage statutes requiring overtime pay for hours worked in excess of 40 hours per workweek. (*Id.* at 8-9.) Essentially, this is a straightforward overtime wage dispute, wherein Plaintiffs contend that they should have been compensated at the standard rate for their overtime hours under the FLSA, while Defendants contend that Plaintiffs were properly classified as exempt employees and therefore were not owed overtime wages for any work they performed in excess of 40 hours per workweek.

Plaintiffs were employed as commercial account managers at GrowersHouse, a hydroponics supplies and indoor gardening center with an online and retail store based in

---

[1] Defendants GrowersHouse, LLC ("GrowersHouse") and GG Growth, LLC ("GG") are limited liability companies with their principal places of business in Pima County, Arizona. (Doc. 1.) Although GG is now the sole member and manager of GrowersHouse, Plaintiffs were employed by "GrowersHouse." For ease of reference the Court will refer to Plaintiffs' employer as GrowersHouse. (*Id.* at 3.)

[2] Plaintiffs brought this action as an "opt-in" collective action on behalf of themselves and all similarly situated employees of Defendants. (Doc. 1.) The Court conditionally certified the action as a collective action. (Doc. 25.) The parties then notified the Court that no prospective class members elected to join, and the case was decertified. (Doc. 32.)

Tucson, Arizona.[3] (Doc. 71 at 1-2, DSOF ¶ 1.) GrowersHouse classified its retail and customer service division employees as non-exempt under the FLSA, while commercial division employees were classified as exempt, purportedly based on the higher levels of discretion, responsibility, and independent judgment involved in commercial sales and account management. (DSOF ¶ 3; PSOF ¶ 3.)[4] Both Plaintiffs were originally hired as customer service or sales representatives earning an hourly wage. (DSOF ¶¶ 4, 5, 10, 11.) Buber was hired in 2016; in 2017 he began managing commercial accounts and receiving a fixed annual salary. (DSOF ¶ 5.) Trejo was hired in 2014; in 2015 he began managing commercial accounts and receiving a fixed annual salary. (DSOF ¶ 11.) From August 4, 2017, until June 25, 2020, Buber's base salary was between $40,000 and $60,000 per year, and he received additional annual bonuses that increased his salary to as high as $82,862.92 in 2019. (DSOF ¶¶ 6, 9.)[5] From December 9, 2015 until June 25, 2020, Trejo's base salary was between $48,000 and $66,950 per year, and he received additional annual bonuses that increased his salary to as high as $68,109.20 in 2017. (DSOF ¶¶ 12, 15.)

The parties present significant disputes concerning the precise nature of Plaintiffs' job duties and responsibilities. According to Defendants, Buber and Trejo's duties included "overseeing the performance and success of assigned outside partners," "maximizing gross profit performance," and establishing and building relationships with customers by "streamlining communication, providing solutions based on product and industry knowledge, and building trust." (DSOF ¶¶ 17-18.) Defendants further state that Plaintiffs were responsible for developing, tracking, and managing "positive direct relationships with commercial scale producers, outside partners, and design-build professionals" and served as "the face of the company" by representing GrowersHouse in

---

[3] GrowersHouse sells products primarily to cultivators of cannabis.

[4] As discussed herein, the parties dispute the precise nature of Plaintiffs' job duties and level of responsibility. (See DSOF ¶ 3, PSOF ¶ 3.)

[5] Plaintiffs dispute Defendants' records of Buber's compensation in 2018 and Trejo's compensation in 2019. While Defendants recorded Buber's 2018 compensation as $42,542.42, Plaintiffs state that it was $46,205.90. (PSOF ¶ 9.) And while Defendants recorded Trejo's 2019 compensation as $57,641.20, Plaintiffs state that it was $83,398.76. (PSOF ¶ 15.)

"direct dealings with customers, vendors, and collaborators." (DSOF ¶¶ 28-29.) Defendants state that Plaintiffs "managed all orders to cash activity for assigned accounts," including "product creation, product selection, price quoting, order entry, submitting purchase orders, scheduling freight and logistics, customer invoicing, payment notifications, and account followups." (DSOF ¶ 32.) Defendants state that Plaintiffs "had discretion with respect to how to accept payment" because payment fraud is an issue in the cannabis industry, and that Plaintiffs managed logistics for shipping orders, including coordinating with vendors and freight carriers to quote and book shipping for large orders being shipped significant distances. (DSOF ¶¶ 35-36.) Defendants state that Plaintiffs were responsible for "resolving conflicts and providing solutions to customers;" as an example, Defendant cites an instance where a customer received damaged lights and Trejo exercised discretion to ship replacement lights before receiving the return, even though GrowersHouse policy was to receive the returned product before shipping a replacement. (DSOF ¶ 37.) Defendants state that Plaintiffs "assessed, determined, and implemented all account specific pricing by reviewing costs and anticipating volumes" and that they analyzed customer supply needs and identified new opportunities for products and vendor partners, including adding products to the GrowersHouse catalogue. (DSOF ¶¶ 38-39, 41-42.) According to Defendants, these responsibilities included adding products to the enterprise resource planning, or ERP, software, called Brightpearl, which involved "determining pricing and margins for the company." (DSOF ¶¶ 41, 42.) Defendants state that Plaintiffs were involved in "directly negotiating better volume pricing and terms," "had discretion to deviate from general guidelines reading pricing margins," and "were authorized to represent GrowersHouse" in negotiations involving pricing with new vendors and committing to doing a certain volume of sales per year. (DSOF ¶¶ 40, 42, 43.) Defendants state that Plaintiffs worked with sales leadership to "develop and implement region specific campaigns and sales strategies," "converted inbound leads to purchasing accounts," and make suggestions for improving sales performance and growth. (DSOF ¶¶ 44-46.) Defendants aver that both Buber and Trejo

were responsible for supervising other sales employees until a Sales Director was hired in 2019. (DSOF ¶ 53.) Trejo was a leader on the sales team and would answer questions and run sales meetings on Lipton's behalf, and Buber co-led the sales team with Trejo from approximately July 2017 to June 2019. (DSOF ¶¶ 54-55.)

Plaintiffs agree with some of Defendants' characterization of their job duties and responsibilities and dispute others. Plaintiffs contend that working in commercial sales did not involve greater responsibility, or any materially different duties, than the other sales roles at GrowersHouse that were classified as non-exempt. (Doc. 75 at 2, PSOF ¶ 3.) Plaintiffs contend that they did not have the ability to exercise independent judgment on matters of significance, but rather followed the rules and guidelines, set by GrowersHouse and Lipton, from which they could not deviate without permission. (PSOF ¶ 3.) Plaintiffs contend that their primary duty was to sell products to customers as customer needs arose and that they were part of a large team wherein others were tasked with managing specific aspects of the business. (PSOF ¶ 3.) Plaintiffs dispute that they "progressed" to "managing commercial accounts," as described by Defendants, and state instead that, as GrowersHouse grew, they naturally transitioned to handling larger transactions but the fundamental nature of their jobs as salesmen did not change. (PSOF ¶¶ 5, 11.) Plaintiffs aver that they were closely supervised by Lipton and that they checked with him when a deviation from standard operating procedures was required. (PSOF ¶ 16.) Furthermore, Plaintiffs aver that they were not able to set pricing, but had to operate within set margins, and could deviate only within pre-approved ranges, the same as any sales employee. (PSOF ¶ 16.) Plaintiffs contend that the written job description, provided by Defendants, was a "farce intended to circumvent the FLSA," written to create an issue of fact and a defense in litigation, and did not reflect Plaintiffs' actual job duties. (PSOF ¶ 16.) Plaintiffs contend that they were never assigned "outside partners" to manage and did not manage any specific regions. (PSOF ¶ 17.) Plaintiffs state that they performed typical salesmen duties, including negotiating and making sales, increasing profit, promptly responding to customer inquiries, and providing customers with

requested products, and state that Defendants stretched the descriptions of these duties in order to give the impression that the job falls within the administrative exemption. (PSOF ¶ 18.) Plaintiffs reiterate that their jobs as salesmen required them to take direction from Lipton when deviations from GrowersHouse rules and policies became necessary. (PSOF ¶ 20.) Plaintiffs dispute that they were the "single point of contact" for any commercial accounts and state that, to the contrary, customers interacted with other GrowersHouse employees throughout their transactions, including for processing payments. (PSOF ¶ 21.) Plaintiffs contend that they did not have any authority to make important or binding decisions on behalf of GrowersHouse. (PSOF ¶ 22.) Plaintiffs state that, in approximately 95% of cases, customers contacted GrowersHouse already knowing what products they needed, and in those instances when a customer had not identified a particular product, Plaintiffs would suggest one that would meet the customer's need. (PSOF ¶ 27.) Plaintiffs aver that their primary duties were to determine whether GrowersHouse had the product available, to price the product based on standard procedures, and to close the sale. (PSOF ¶ 27.) Plaintiffs contend that they did not conduct negotiations with, supervise, or actively maintain relationships with "commercial scale producers, outside partners, and design-build professionals," though they contacted such entities if a need arose. (PSOF ¶ 28.) Plaintiffs dispute the assertions that they were "the face of the company and represented the company" or that they had authority or discretion to bind the company in any meaningful way. (PSOF ¶ 29.) Plaintiffs state that they did not create products in the GrowersHouse catalogue but simply took preliminary steps to do so; the task of adding the product was completed and approved by others. (PSOF ¶ 32.) Plaintiffs also did not regularly create invoices; that task was typically performed by the accounting department. (PSOF ¶¶ 32, 24.) They did, however, sometimes transmit invoices prepared by accounting. (PSOF ¶ 34.) Plaintiffs dispute that they had much, if any, discretion regarding payment methods and acceptance thereof; Plaintiffs contend that payments were largely automated or otherwise handled through accounting, and to the extent that Plaintiffs handled payments they followed explicit instructions. (PSOF ¶ 35.) Plaintiffs

dispute that accepting any of the approved payment methods constitutes "discretion." (PSOF ¶ 35.) Plaintiffs state that calculating shipping costs generally involved inputting shipping information into a system that would electronically bid the cost to various shippers, from which Plaintiffs would select the option that could provide delivery within the necessary time frame at the best price. (PSOF ¶ 36.) Plaintiffs dispute that they ever exercised discretion in resolving conflicts; Plaintiffs do not dispute the one instance when Trejo exercised discretion to ship new lights to a customer before receiving a replacement but contend that this is not evidence of Trejo's "freedom to exercise independent judgment in that instance or generally." (PSOF ¶ 37.) Plaintiffs aver that they did not set prices, which were set by Lipton or the Sales Director, Renee Shoppach, and that they could deviate from pricing only within a preapproved range. (PSOF ¶ 38.) Plaintiffs aver that they were not responsible for projecting inventory or product needs, and that decisions to add a vendor or source for a product were made by Lipton or Shoppach. (PSOF ¶¶ 39-41.) Plaintiffs state that they did not negotiate prices with vendors and could not commit the company to purchasing at volume to secure volume discounts. (PSOF ¶ 40.) Plaintiffs contend that they never worked to develop or implement "region specific campaigns and sales strategies" and that these tasks were exclusively within the purview of Lipton and Shoppach. (PSOF ¶ 44.) Plaintiffs state that, as they gained experience and knowledge, they became more familiar with various sales and situations, as well as GrowersHouse operating procedures, but that this does not mean they exercised independent judgment on matters of importance. (PSOF ¶ 47.) Plaintiffs dispute that either Buber or Trejo had a formal management or leadership role within GrowersHouse or that they had any actual authority over their coworkers. (PSOF ¶¶ 54, 55.) Plaintiffs state that Trejo only held meetings when directed to do so, but did not have authority to call meetings, set agendas, or enforce policies and procedures. (PSOF ¶¶ 54-56.)

Plaintiffs provide additional facts in support of their opposition to Defendant's Motion for Summary Judgment. (Doc. 75 at 20-23.) Plaintiffs state that, during a

previous legal dispute with a former GrowersHouse employee, Casey Lohrenz,[6] Defendants learned, through consultation with various attorneys and human resources professionals, that Plaintiffs' position did not qualify for an FLSA exemption. (*Id.* at 20; *see* Doc. 75-3 at 139-140, 176-182, 208-209.) Plaintiffs cite the deposition of Stephanie Ballesteros,[7] in which she explains that the legal professionals with whom she consulted regarding the FLSA status of Plaintiffs' position confirmed that the position did not qualify for an FLSA exemption. (*Id.*; see Doc. 75-3 at 139-148, 176-182; Doc. 75-12.) Defendants rely on the deposition testimony of Ballesteros and Alizette Maldonado,[8] as well as internal email communications, for support for the proposition that Defendants disregarded legal advice and/or information that Plaintiffs' position did not qualify for an FLSA exemption and decided to classify them as exempt anyway, in an effort not to pay them overtime wages. (*Id.*; *see also* Docs. 75-3, 75-8 at 102-103, 136-137, 144, 148-149, 75-12.) Plaintiffs further contend that, while employed at GrowersHouse, they never managed the business or any of its departments, did not "customarily and regularly direct the work of at least two or more other full-time employees," and had no authority to hire or fire employees or recommend changes in employee status. (*Id.* at 21-22.)

Plaintiffs further state that Defendants did not present the defense that Plaintiffs qualified for an exemption under the FLSA's executive exemption at any point in the litigation prior to their Motion for Summary Judgment. (*Id.* at 21; Doc. 75-11.)

**III.   Discussion**

Defendants move for summary judgment on Plaintiffs' claim that they should have been classified as non-exempt under the FLSA. (Doc. 70.) Defendants argue that Plaintiffs fell within the administrative exemption because they (1) received a qualifying salary; (2) their primary duty was that of performing office work directly related to the management of general business operations of GrowersHouse; and (3) their primary duty

---

[6] Lohrenz entered into a settlement agreement regarding his payment disputes in October 2018. (Doc. 75-9 at 19.)
[7] Ballesteros was GrowersHouse's Controller until March 2020. (Doc. 75-9 at 9.)
[8] Alizette Maldonado was GrowersHouse's Human Resources Manager until March 2020. (Doc. 75-9 at 9.)

included the exercise of discretion and independent judgment with respect to matters of significance. (*Id*. at 9-10.) Defendants contend that Plaintiffs' duties as "sales managers," such as building and maintaining relationships with customers, consulting regarding equipment for customers' design-builds, and purchasing, procurement, and personnel management, all with "relative freedom from direct supervision," as well as the pay differential between Plaintiffs and other sales employees, show that their primary duties were directly related to the management or general business operations of GrowersHouse. (*Id*. at 10-13.) Defendants argue that Plaintiffs were more than mere salespeople taking orders, but rather were responsible for administering business operations within GrowersHouse, including opening new vendor accounts and negotiating costs with new vendors, negotiating prices with customers, managing shipping logistics, and supervising other employees. (*Id*. at 12.) Defendants argue that Plaintiffs ensured that their sales resulted in profits to the company. (*Id*. at 13.) Defendants further argue that the range of discretion Plaintiffs exercised as sales managers is aligned with cases in which courts have found that the third prong of the administrative exemption applied. (*Id*. at 13-14.)

Defendants also argue that Plaintiffs fall within the executive exemption. (*Id*. at 15-16.) Defendants contend that, by virtue of their supervision of the sales floor, Plaintiffs supervised a "customarily recognized department or subdivision" within the meaning of the applicable regulations. (*Id*. at 16.) Defendants further argue that Plaintiffs directed the work of more than two employees as managers of the sales floor, worked relatively free from direct supervision, and influenced hiring and firing decisions at GrowersHouse. (*Id*. at 16-17.) Lastly, Defendants argue that Plaintiff's Arizona wage law claim should be dismissed with respect to paychecks issued before July 17, 2019, based on the one-year statute of limitations. (*Id*. at 17.)

In response, Plaintiffs argue that summary judgment is impossible because the parties present a factual controversy regarding Plaintiffs' actual day-to-day job duties. (Doc. 74 at 9.) While Defendants rely heavily on the written job description and the testimony of Nathan Lipton, Plaintiffs contend that these sources misrepresent Plaintiffs'

actual day-to-day duties and the extent of their involvement in business operations, and that Plaintiffs' own accounts of their job duties differs enough to create material questions of fact. (*Id*. at 9-10.) Plaintiffs do not dispute that the minimum salary requirement of the administrative exemption is met but contest the remaining two elements of the exemption. (*Id*. at 12.) Plaintiffs contend that their duties as salespeople, including generating sales, addressing customer concerns, negotiating costs of items and sale prices, managing shipping logistics, and ensuring profit for GrowersHouse, were not related to running or servicing the business. (*Id*. at 12-13.) Plaintiffs argue that Defendants' assertion that they supervised other employees lacks evidentiary support in the record. (*Id*. at 13.) Plaintiffs maintain that the factual discrepancies between the parties' respective positions can only be resolved by a credibility determination by the trier of fact. (*Id*. at 14.)

Plaintiffs take further issue with Defendants' analogies to other cases finding sales managers exempt from the FLSA and argue that those cases are not analogous to the instant case. (*Id*. at 14-16.) For example, Plaintiffs contend that, in contrast to sales managers in those cases, they (1) attended trade shows only infrequently; (2) were involved primarily in generating, not promoting, sales, even if the sales sometimes required multiple conversations or product recommendations; (3) focused their sales efforts on single clients, not groups; and (4) did not direct their work at the public generally but were focused only on closing specific sales with individual customers. (*Id*. at 15-16.) Plaintiffs argue that sales employees in other cases were found exempt because their work primarily involved promoting sales, including marketing products and communicating with customers regarding the products, in contrast to generating specific sales and directly increasing sales and profit, which are not exempt activities. (*Id*. at 16.) Plaintiffs argue that their work did not substantially affect the structure and function of GrowersHouse's operations and management because, even though they generated significant revenue year after year, their work did not impact how the business was run or operated. (*Id*. at 17-18.)

1    Plaintiffs argue that Defendants should be precluded from arguing that Plaintiffs
2    fall within the executive exemption to the FLSA because they never provided notice of
3    their intent to argue the executive exemption. (*Id.* at 10-11.) In response to Plaintiff's
4    discovery request seeking disclosure of the factual and legal bases for their FLSA
5    exemption, Defendants responded by stating that the administrative exemption applied
6    and did not thereafter supplement or amend their response. (*Id.* at 11.) Plaintiffs contend
7    that the failure to disclose this legal theory should bar its use, pursuant to the application
8    of sanctions for failure to disclose discovery material. (*Id.*) (*see* Fed. R. Civ. P. 37(c)(1)
9    (if a party fails to provide information discoverable under Rule 26(a) or (e), it may not
10   use that information as evidence on a motion "unless the failure was substantially
11   justified or is harmless"); *West v. City of Mesa*, 128 F. Supp. 3d 1233, 1247 (D. Ariz.
12   2015), *aff'd*, 708 F. App'x 288 (9th Cir. 2017) (citing *Yeti by Molly, Ltd. v. Deckers
13   Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)) (this sanction is a "self-executing,
14   automatic sanction to provide a strong inducement for disclosure of material"). However,
15   even if the executive exemption is considered, Plaintiffs argue that it fails on the merits
16   because Plaintiffs' primary duty as salespeople was to interact with customers to close
17   sales and they did not manage or supervise two or more employees or a subdivision. (*Id.*
18   at 11-12.) Further, they did not have authority to make or significantly influence hiring,
19   firing, or disciplinary decisions related to other employees. (*Id.* at 12.)

20   **A. Applicable Law**

21       **a. Administrative Exemption**

22       Pursuant to the FLSA, the Secretary of the Department of Labor ("DOL") has
23   issued regulations defining each exemption. *See* 29 C.F.R. § § 541.200–541.215. The
24   relevant implementing regulations defining and explaining the administrative exemption
25   state as follows:

26       (a) The term "employee employed in a bona fide
         administrative capacity" in section 13(a)(1) of the Act shall
27       mean any employee:
         (1) Compensated on a salary or fee basis pursuant to §
28       541.600 at a rate of not less than $684 per week (or $455 per

week if employed in the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, or the U.S. Virgin Islands by employers other than the Federal government, or $380 per week if employed in American Samoa by employers other than the Federal government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is the performance of **office or non-manual work directly related to the management or general business operations of the employer** or the employer's customers; and

(3) Whose primary duty includes **the exercise of discretion and independent judgment with respect to matters of significance**.

(b) The term "salary basis" is defined at § 541.602; "fee basis" is defined at § 541.605; "board, lodging or other facilities" is defined at § 541.606; and "primary duty" is defined at § 541.700.

29 C.F.R. § 541.200 (emphasis added).

(a) To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

(b) Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

(c) An employee may qualify for the administrative exemption if the employee's primary duty is the performance

of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.

29 C.F.R. § 541.201.[9] Regarding the meaning of the term "primary duty," the regulations state:

(a) To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

(b) The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

(c) Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing

---

[9] The regulations regarding the exercise of discretion and independent judgment with respect to matters of significance are set forth at 29 C.F.R. § 541.202. The exercise of discretion and independent judgment is a fact-intensive analysis that the Court does not engage in here, for the reasons discussed *infra* in Section III(B)(a). Therefore, those regulations will be omitted.

payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700.

"The FLSA is a remedial statute designed to eliminate 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency, and general well-being of workers.'" *Blotzer v. L-3 Commc'ns Corp.*, No. CV-11-274-TUC-JGZ, 2012 WL 6086931, at *3 (D. Ariz. Dec. 6, 2012) (citing 29 U.S.C. § 202). The FLSA sets a maximum number of hours employees may work per week. *Id.* (citing 29 U.S.C. § 207). Unless an FLSA exemption applies, employees who work more than forty hours per week must be compensated for every hour worked over forty at a rate "not less than one and one-half times the regular rate at which he is employed." *Id.* (citing 29 U.S.C.§ 207(a)(1)). "In a FLSA overtime-wage case, the question of how an employee spends his or her workday is one of fact, while the question of whether his or her activities exclude him or her from the overtime-pay requirement is one of law." *Id.* (citing *Christopher v. SmithKline Beecham Corp.*, 635 F.3d 383, 391 (9th Cir. 2011) (citations omitted). "It is impossible to determine whether [an employee's] work [is] exempt . . . until the nature of his daily activities is resolved by the fact-finder." *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1128 (9th Cir. 2002).

The Supreme Court has rejected the principle that exemptions to the FLSA should be narrowly construed. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). "Because the FLSA gives no textual indication that its exemptions should be construed narrowly, there is no reason to give them anything other than a fair (rather than a 'narrow') interpretation." *Id.* (internal citation and quotation omitted). However, the FLSA exemptions "are to be withheld except as to persons plainly and unmistakably within their terms and spirit." *Ader v. SimonMed Imaging Inc.*, 465 F. Supp. 3d 953, 960

(D. Ariz. 2020) (citing *Klem v. Cty. of Santa Clara*, 208 F.3d 1085, 1089 (9th Cir. 2000)). The employer "bears the burden of establishing its contention that the FLSA's administrative exemption applies to the plaintiffs." *In re Allstate Ins. Co. Fair Lab. Standards Litig.*, 2007 WL 2274802, at *7 (D. Ariz. Aug. 7, 2007) (citing *Bothwell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002)).

"An employee's primary duty is 'the principal, main, major or most important duty that the employee performs.'" *McKeen-Chaplin v. Provident Sav. Bank, FSB*, 862 F.3d 847, 851 (9th Cir. 2017) (citing 29 C.F.R. § 541.700(a)). "In interpreting the primary duty requirement, although the percentage of time spent on nonexempt tasks is relevant, it is not alone dispositive." *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1114 (9th Cir. 2001). "[A] court must first determine the employee's primary duty, and then determine whether that primary duty disqualifies the employee from FLSA's protections." *Blotzer*, 2012 WL 6086931 at *4 (citing *Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 827 (10th Cir. 2012)). "[I]f the record is unclear as to some exemption requirement, the employer will be held not to have satisfied its burden [of proving exemption]." *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir. 1991) (citing *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206 (1966)).

In *Martin v. Cooper Elec. Supply Co.*, "inside salespersons" at the defendant company were not exempt under the FLSA because their primary duty was to produce sales, not to administratively operate the business. 940 F.2d 896, 902-903 (3d Cir. 1991). The salespeople spent the majority of their time answering calls from customers seeking to purchase wholesale electrical supplies and products. *Id*. at 902. The salespeople received a fixed salary plus incentive bonuses based on sales performance. *Id*. at 902-903. The products were mostly from in-house inventory and were priced based on various sources, including an in-house computer that created a pricing matrix based on a customer's purchase record. *Id*. at 903. Salespeople were permitted to deviate upward or downward from price quotes, and if a particular item was not in stock, they could request it from the manufacturer and then negotiate the price with both the manufacturer and the

customer. *Id*. at 903. The court concluded that the salespeople's primary duty was producing sales and that the concept of production, in the context of production vs. administration, was "not limited to manufacturing activities." *Id*. at 903-904. It further concluded that the job duties of negotiating product purchases from manufacturers, negotiating some prices and terms with customers, occasionally advising customers regarding certain products, and negotiating on behalf of the company to make a sale to a particular customer, did not make the salesperson role "administrative." *Id*. at 904-905.

In *Feiler v. Hyatt Corp*, the court distinguished the plaintiff sales managers from those in *Cooper Electric* and found that they were exempt under the FLSA because their primary duties involved the administrative tasks of promoting and marketing the company's services, not making routine sales. 1999 WL 34825657, at *4 (S.D. Fla. Dec. 13, 1999), report and recommendation adopted, No. 98-2863-CIV, 2000 WL 35594362 (S.D. Fla. Feb. 14, 2000). The court made this finding based on the facts that the employees (1) were selling the services and facilities of the hotel, not just products (2) were responsible for promoting and marketing the hotel in their respective assigned territories, and spent 80% of their working time promoting sales and negotiating group contracts; (3) spent the remaining 20% of their time attending meetings and strategizing on maximizing sales; and (4) delegated to and supervised office and clerical work of sales assistants. *Id*. at *6-7. The employees regularly performed the duties of entertaining prospective accounts, researching and pursuing leads for new business, making group presentations, networking and attending trade shows, developing and strengthening relationships with local organizations and the company's national sales offices, brainstorming ways to increase sales in their assigned regions, cold calling, and introducing the public to the hotel's facilities. *Id*. at *7. The court contrasted the *Hyatt* sales managers from the salespeople in *Cooper Electric*, finding that, unlike the *Cooper Electric* employees, who made routine sales over the phone, the *Hyatt* sales managers had to "grasp the realities of the relevant market" and "structure and negotiate" large and complicated deals. *Id*. at *7. The *Hyatt* sales managers were structuring contracts and

manipulating and reconfiguring packages to suit group needs, processes that cost tens of thousands of dollars to complete and could take as long as three months to finalize. *Id*. This contrasted with the *Cooper Electric* salespeople, who conducted "ordinary day-in-day-out selling activity directed at making distinct sales." *Id*.

### b. Executive Exemption

Pursuant to the FLSA, the Secretary of the Department of Labor ("DOL") has issued regulations defining each exemption. *See* 29 C.F.R. § § 541.200–541.215. The relevant implementing regulations defining and explaining the executive exemption state as follows:

> (a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:
> (1) Compensated on a salary basis pursuant to § 541.600 at a rate of not less than $684 per week (or $455 per week if employed in the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, or the U.S. Virgin Islands by employers other than the Federal government, or $380 per week if employed in American Samoa by employers other than the Federal government), exclusive of board, lodging or other facilities;
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more other employees; and
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100.

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the

purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

(a) To qualify as an exempt executive under § 541.100, the employee must customarily and regularly direct the work of two or more other employees. The phrase "two or more other employees" means two full-time employees or their equivalent. One full-time and two half-time employees, for example, are equivalent to two full-time employees. Four half-time employees are also equivalent.

(b) The supervision can be distributed among two, three or more employees, but each such employee must customarily and regularly direct the work of two or more other full-time employees or the equivalent. Thus, for example, a department with five full-time nonexempt workers may have up to two exempt supervisors if each such supervisor customarily and regularly directs the work of two of those workers.

(c) An employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence does not meet this requirement.

(d) Hours worked by an employee cannot be credited more than once for different executives. Thus, a shared responsibility for the supervision of the same two employees in the same department does not satisfy this requirement. However, a full-time employee who works four hours for one supervisor and four hours for a different supervisor, for example, can be credited as a half-time employee for both supervisors.

29 C.F.R. § 541.104.

Even if an employee spends less than fifty percent of their time performing exempt work, they may nevertheless be engaged in management activities "if other pertinent factors support such a conclusion, such as: (1) the relative importance of [employees'] managerial duties as compared with other types of duties; (2) whether the [employees] have relative freedom from supervision; and (3) the relationship between the [employees'] salaries and the wages paid to other employees for the same kind of non-managerial work performed by those employees." *Taylor v. AutoZone, Inc.*, 572 F. App'x 515, 516 (9th Cir. 2014) (citing 29 C.F.R. § 541.700(a); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1114 (9th Cir. 2001)). If there is conflicting evidence regarding the relative importance of management vs. nonexempt duties, extent of supervision, pay differentials between management and nonexempt employees, or whether employees had authority to make hiring, firing, or promotion-related recommendations, material questions of fact exist as to whether management is the primary duty. *Id*. at 516-517.

**B. Analysis**

**a. Administrative Exemption**

Upon review of the record and relevant law, the Court finds that a material question of fact exists regarding the second factor of the administrative exemption, that is, whether Plaintiffs' primary duties were directly related to the management or general business operations of GrowersHouse. Accordingly, summary judgment in favor of Defendants must be denied.

As discussed above, to meet the second requirement of the administrative exemption, an employee's "primary duty" must be to perform "office or non-manual work directly related to the management or general business operations of the employer." To fulfill this requirement, an employee must directly assist with running or servicing the business, as opposed to selling products. The parties agree that Plaintiffs' primary duties were office or non-manual work; however, they disagree as to whether that work was directly related to the management or general business operations of GrowersHouse. The parties present conflicting factual accounts of whether Plaintiffs' duties were primarily

related to managing or operating the business. For example, Defendants contend that Plaintiffs built and maintained relationships with customers and business partners, were responsible for increasing sales within specific regions, performed purchasing, procurement, and personnel management tasks, ensured that GrowersHouse made a profit, and worked with less supervision and higher pay than other sales employees. Defendants also point to specific examples of duties that could fall within the exemption, such as running a sales team meeting or reaching out to former customers to inquire about their product needs. Defendants contend that these duties qualify for the second requirement of the administrative exemption. Plaintiffs, on the other hand, argue that their primary duties were to receive and process product orders from customers and to facilitate and close specific sales, and that the tasks of negotiating costs and pricing, coordinating shipping, and ensuring profit do not constitute business management or operations.

The Court agrees with Plaintiffs that the duties of receiving, processing, and closing sales, negotiating costs and pricing, coordinating shipping, ensuring profit, and generally meeting the needs of specific customers are not directly related to the management or operation of the business. The *Cooper Electric* court held that sales employees who spent the majority of their time taking orders from customers, sometimes advising customers on product needs, were permitted to deviate upward or downward on pricing depending on the situation, could negotiate on behalf of the company in order to make a particular sale, could request products from manufacturers if they were not in stock, and were paid a fixed salary plus bonuses based on sales performance, did not qualify for the administrative exemption because their primary duties were not directly related to business management or operations. As discussed above, Plaintiffs have presented evidence that their primary duties were analogous to those of the sales employees in *Cooper Electric* and they should therefore have been classified as nonexempt.

Furthermore, a clear factual dispute exists regarding whether any administrative duties performed by Plaintiffs constituted their primary duties. Indeed, Plaintiffs do not dispute that, at times, they performed some duties that properly fall within the administrative exemption. However, they contend that those were not their primary duties. Defendants, on the other hand, contend that they were. As discussed above, the question of how an employee spends his working time is a question of fact, and the parties present a legitimate dispute regarding what work Plaintiffs performed on a day-to-day basis. Therefore, Defendants have not met their burden of showing that no material question of fact exists regarding the nature of Plaintiffs' job duties. Accordingly, drawing all factual inferences in favor of Plaintiffs, a question of fact exists as to whether Plaintiffs meet the second requirement of the administrative exemption, and summary judgment must be denied.[10]

### b.  Executive Exemption

As an initial matter, the Court finds that Defendants are not precluded from arguing the executive exemption at this stage in the proceedings. Defendants contend that, pursuant to Rule 37(c)(1), their failure to disclose the executive exemption theory is harmless because Plaintiffs were not prejudiced by the lack of notice. (Doc. 78 at 10-11.) They argue that Plaintiffs have not articulated any prejudice resulting from the failure to disclose the executive exemption theory. (*Id.*) The Court agrees that, although Plaintiffs claim that the executive exemption theory should be precluded under Rule 37(c)(1), they have not articulated any prejudice from Defendants' failure to disclose it. Furthermore, the record reflects that Plaintiffs deposed multiple witnesses regarding tasks and duties related to the requirements for the executive exemption. Plaintiffs have not identified any specific discovery they would have sought had they had earlier notice of the executive exemption theory. Accordingly, Defendants' failure to disclose the executive exemption theory was harmless.

---

[10] As summary judgment will be denied on this basis, the Court does not reach the issue of whether a question of fact exists regarding the third requirement of the administrative exemption, that is, whether Plaintiff exercised discretion and independent judgment with respect to matters of significance.

Upon reviewing the merits of the parties' respective positions, the Court finds that a material question of fact exists regarding whether Plaintiffs customarily and regularly directed the work of two other employees. Although Defendants presented evidence that Plaintiffs ran sales team meetings, served in leadership roles on the sales team, and answered questions from other sales employees, the Court has not located any evidence in the record showing that Plaintiffs regularly directed the work of two or more other employees. Defendants have not presented evidence showing that Plaintiffs directed the work of any other employees, let alone two or more. To the extent that Plaintiffs may have supervised other employees only in Lipton's absence, 29 C.F.R. § 541.104(c) states that such temporary or intermittent supervision does not meet the requirements for the executive exemption. Furthermore, Plaintiffs presented evidence, in the form of their deposition testimony and declarations, that they did not customarily or regularly direct the work of two or more other employees. This evidence presents a genuine dispute over the underlying facts of how Plaintiffs spent their time at work. Accordingly, drawing all factual inferences in favor of Plaintiffs, a question of fact exists as to whether Plaintiffs meet the third requirement of the executive exemption, and summary judgment must be denied.[11]

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 70) is **denied**.

Dated this 23rd day of February, 2023.

Honorable Rosemary Márquez
United States District Judge

---

[11] As summary judgment will be denied on this basis, the Court does not reach the issue of whether a question of fact exists regarding the second and fourth requirements of the executive exemption.